## IN THE UNITED STATES DISTRICT COURT FOR THE
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| MARK A. HURT, | DOCKET #5:02-CR-16-001 |
| **Defendant.** | |

### DEFENDANT'S SENTENCING BRIEF

Defendant, Mark Hurt, submits this brief to the Court in support of his objections to the Pre-Sentence Investigation Report as revised pursuant to those objections. Attached hereto as Exhibit "A" is a copy of Defendant's <u>Objection to and Additional Information for the Pre-Sentence Investigation Report</u>. All assertions of facts made in Exhibit "A" are adopted herein.[1]

The issues to be discussed in the sections that follow are few and simple. First, the Probation Officer has made a suggestion to the Court that the "intended loss" theory should be applied to Defendant Hurt's case. However, the Government, nor the Probation Officer, can show that any loss other than the "actual loss" was intended. Second, the Probation Officer suggests to the Court that USSG §2F1.1 may justify an upward departure if the Court finds that there are instances of "relevant conduct", as defined under USSG §1B1.3(a)(2). As will be shown below, this argument is flawed in that it fails to take into consideration that where there is no more loss occasioned by "relevant conduct", it cannot count for Guideline computation purposes. In the instant case, any relevant conduct by Defendant that could be alleged did not

---

[1] Any additional facts not contained in Exhibit "A" are stated herein.



occasion any more loss than the amount of actual loss, and, accordingly, no upward departure should be made.

## I.    THERE WAS NO INTENDED LOSS IN THIS CASE

In Paragraphs 15 and 23 of the Pre-Sentence Investigation Report, the Probation Officer attempts to show this Court that Defendant Hurt should be sentenced using an intended loss theory, because she contends that the intended loss in this case, $3,350,000.00, is greater that the actual loss, $2,088,026.20.[2]  (See Pre-Sentence Report, pp. 3 and 5).  Additionally, the Probation Officer argues that the intended loss is the "maximum amount of the outstanding **credit lines** ($1,950,000.00 for Exchange Bank; $1,400,000.00 for First National Bank) which could have been lost by the banks if the notes had been called due when the notes were pledged with fraudulent collateral."  (Id. at 3) (emphasis added).  Therefore, the Probation Officer states that the loss figure to be used by the Court is $3,350,000.00.

First, as to the facts of this case, the Probation Officer is mistaken about the type of financial transactions between the Defendant and the banks.  Namely, the Probation Officer misunderstands the nature of banking transactions when she compares the type of transaction between the Defendant and the victim banks to a "line of credit."  **Even the President of victim First National Bank will testify that the type of transaction here did not create a conventional line of credit transaction.**  A line of credit exists where a borrower enters into an agreement with a bank establishing a maximum lending limit against which the borrower makes periodic draws.  The draws cannot exceed the established maximum amount, and sufficient collateral is required and is set at the time the credit line is established.  The collateral does not fluctuate unless the credit line is increased, at which time the bank may require submission of

---

[2] Defendant does not agree with either the "intended loss" figure or the "actual loss" figure.  These numbers are merely representative of the Probation Officer's calculations as contained in the amended Pre-Sentence Investigation Report.

additional collateral. During the life of the credit line, the borrower makes regular payments, which payments. Those payments are based upon an agreement between the bank and the borrower and are not based upon specific collateral or other factors.

A line of credit is contrasted to an accounts receivable factoring arrangement by several factors. One factor is that the collateral changes every 60 days here, while in a line of credit, it remains constant. There is no ceiling established on the amount of funds that could be obtained through accounts receivable factoring; the amount being based strictly on the amount of accounts receivables submitted. Another distinction of factoring is that at the time the Accounts Receivable Program was established, the accounts, that were later used to obtain funds from the victim banks, were not even in existence. Another key distinction is the fact that accounts receivables must be paid off or redeemed every 60 days. Where a customer has a line of credit agreement with a bank, he is not required to pay the debt in full every sixty days. If this had been a traditional line of credit, the Defendant would not have engaged in a fraudulent scheme, because there would be no requirement for him to manufacture accounts every 60 days.

The Probation Officer, in Paragraphs 14 and 15, calculates the loss occasioned by the fraud as "intended loss," not actual loss, defining intended loss as the total debt. If this were, in fact, a true line of credit, this argument has facial appeal. However, inasmuch as the transaction between the Defendant and the victim banks was not a line of credit arrangement, even this facial appeal evaporates. Using her theory to the facts of this case, the intended loss would be unlimited because under the arrangement with the banks, there was no maximum ceiling limiting the amount that could be obtained by factoring invoices.[3]

---

[3] As stated previously, it is anticipated that the President of the First national Bank will testify that the Accounts Receivable Factoring Program is not a line of credit.

In Paragraph 25 of her report, the Probation Officer argues that the Defendant deprived the banks of $4.2 million in collateral, and he received a benefit of that $4.2 million because he did not have to submit valid collateral in that amount. The Probation Officer obviously derives this $4.2 million in collateral from totaling the facial amounts of each invoice submitted. However, it is important for the Court to note that the actual principal debt never exceeded $2.2 million. Therefore, following the Probation Officer's logic, if she were correct, the following example would be true. A person goes to a financial institution and signs a $1,000.00 promissory note, which is due and payable within 30 days of the date the note is taken out. However, when the note becomes due, the person cannot pay the note and chooses to roll the note over into another 30-day period and simply pay the interest on the note. Assuming this is done 100 times until the man defaults on the note, using the Probation Officer's analysis of Defendant Hurt's case, the bank would be entitled to $100,000.00 as collateral on the 30-day $1,000.00 note. However, the exposure to the bank for the entire amount and the entire 100-month period would never increase from the $1,000.00 original amount. Again, this is clearly nonsensical, since the Probation officer in this case would assume that the intended loss equaled the $100,000.00, even though the man could have never defaulted the bank more than the $1,000.00 amount of the promissory note. Instead, applicable law and common sense dictate, the intended loss and the actual loss would equal the $1,000.00 of the original note.

Defendant Hurt never posted any collateral in advance to secure a maximum amount for which he could make draws until that maximum was reached. Additionally, Defendant Hurt never signed any documentation that is customary when establishing a line of credit with a financial institution. Therefore, the Probation Officer's entire premise concerning "intended loss" at an amount of $3,350,000.00 is clearly wrong. Facts developed later in this brief and as

contained in the <u>Objection to and Additional Information for the Presentence Investigation</u> <u>Report</u> will show the Court that the loss occasioned by Defendant Hurt's fraud could never equal to $3,350,000.00 and could not have extended beyond the actual loss occasioned by the fraud.

Additionally, the $3,350,000.00 loss figure, as stated by the Probation Officer, represents a direct misapplication of the law. First, intended loss is only used when it is shown that a defendant realistically intended a greater loss, or a greater loss was probable, than the proven actual loss. In this case, that necessary evidence of intent does not exist. The law in this Circuit has expressly rejected that the entire face amount of a loan, credit line, et cetera, could be used as the loss figure without some reliable evidence that the intent or probability of that loss actually existed.[4] Finally, since the transactions between Defendant Hurt and the victim banks were not traditional lines of credit as the Probation Officer presupposes, Hurt could never have increased his debt to the amount listed in the Pre-Sentence Investigation Report.

### A. Intended Loss is Used Only When Probable and Greater than Actual Loss

A review Federal Sentencing Guideline 2(F)1.1 and Eleventh Circuit case law interpreting this guideline indicates that there are only two types of loss calculation. <u>U.S. v Renick</u>, 273 F.3d 1009, 1027 (11th Cir. 2001); <u>U.S. v Tatum</u>, 138 F.3d 1344 (11th Cir. 1998); <u>U.S. v Toussaint</u>, 84 F.3d 1046 (11th Cir. 1996); <u>U.S. v Wilson</u>, 993 F.2d 214 (11th Cir. 1993); <u>U.S. v Menichino</u>, 989 F.2d 438 (11th Cir. 1993). These two types of loss calculation are commonly referred to as "actual loss" and "intended loss." <u>Id</u>. These are the only two loss calculations that are used by and allowed in this Circuit.

The Eleventh Circuit has held that in fraudulent loan application cases and contract procurement cases, loss is calculated as either the actual loss to the victim, if there is such loss,

---

[4] See <u>U.S.v. Wilson</u>, 993 F.2d 214, 218 (11th Cir. 1993).

or, if no loss has occurred yet, the intended or expected loss is calculated. See U.S. v Renick, 273 F.3d at 1027. This Circuit has held that where intended loss is greater than actual loss, the intended loss is used. Id. See also U.S. v Toussaint, 84 F.3d 1406 (11th Cir. 1996). Finally, many other circuits use the actual loss versus intended loss calculations as does the Eleventh Circuit. See U.S. v Channapragada, 59 F.3d 62 (7th Cir. 1995); U.S. v Shaw, 3 F.3d 311 (9th Cir. 1993); U.S. v Nichols, 229 F.3d 975 (10th Cir. 2000) (**holding that the defendant must "realistically intend" a particular loss or that the loss is probable**); U.S. v Allen, 88 F.3d 765 (9th Cir. 1996); U.S. v Johnson, 16 F.3d 166 (7th Cir. 1994); U.S. v Holiusa, 13 F.3d 1043 (7th Cir. 1994); U.S. v Bennett, 37 F.3d 687 (1st Cir. 1994).

In addition to using intended loss only if it is greater than actual loss, the law specifically rejects calculating fraud loss based on entire face amounts of loan applications, extended credit lines or other type of financial lending practices. U.S. v Wilson, 993 F.2d 214, 218 (11th Cir. 1993); U.S. v Tatum, 138 F.3d 1344 (11th Cir. 1998); U.S. v Mancuso, 42 F.3d 836 (4th Cir. 1994); U.S. v Menichino, 989 F.2d 438 (11th Cir. 1993). In Wilson, the Court of Appeals held that a district court erred in calculating loss based on entire face amounts of fraudulently induced loans. 993 F.2d at 218. In Menichino, the Court stated that in cases involving misrepresentation of assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lender could recover from collateral. 989 F.2d 438 (11th Cir. 1993). In Mancuso, the amount of loss was determined to be equal to the amounts of actual checks, which had been diverted from the bank in payment of invoices submitted for collateral. 42 F.3d at 850. This was determined to be the amount of the actual loss, rather than the total amount of a revolving line of credit. Id.

Therefore, before intended loss may be used in calculating loss to a victim, it must be proven to have been probable or realistically intended. The intended loss must also be greater than the actual loss. As the Court will undoubtedly see, neither of these two requirements of the intended loss theory are present in the instant case.

### B. Defendant Hurt Did Not Intend Any Loss

Both defense counsel and the Assistant United States Attorney agree that the law governing this case is that which is applicable to contract procurement and fraudulent loan application cases. However, a major distinction between the facts of this case and the contract procurement and fraudulent loan application cases is that the latter involve situations where assets were misrepresented **for the purpose of obtaining a loan**. The gravamen of this case is that the assets were not misrepresented to obtain a loan, but rather to obtain forbearance or to "buy time" to repay loans that already existed and **were validly obtained**.

In fraudulent loan application or contract procurement cases, the law clearly recognizes that the loss is the total amount of the loan. Here, the fraud loss cannot be the total amount of the loan, nor can it be the total amount of the fraudulent invoices that were submitted, since the loss cannot be more than the total amount of unpaid, fraudulent invoices at the time the fraud was uncovered. Under the circumstances of this case, where invoices were paid on a 60-day cycle, the loss equals those fraudulent invoices remaining unpaid in the last sixty days. The fraudulent invoices remaining in the last sixty days represent the loss, because the submission of new invoices, in effect paid off the old invoices. Therefore, the old invoices could not occasion a loss since they were paid in full.

Intended loss is a concept used by the Sentencing Guidelines to cover those matters where a defendant intended to cause a loss greater than that actually caused. There are a number

of cases, however, where the intended loss and the actual loss are the same. This is such a case. First, at the time the fraudulent invoices were submitted, **no additional monies were extended or obtained**. The fraudulent invoices, as previously stated, were used only for the purpose of "buying time" whenever at the end of the 60-day cycle, the banks would contact Hurt to make payment or substitute new invoices. If funds or valid invoices were not available, then fraudulent invoices were submitted. But even after the fraudulent invoice scheme began, Hurt submitted not only fraudulent invoices, but also valid invoices, so that that at any given time the bank was in possession of both, which were used to collateralize the debt. Since each new invoice paid off prior invoices that had been submitted, only the amount of the outstanding fraudulent invoices could be the loss. Under these facts, the intended loss is the same as the actual loss. The following analysis demonstrates that when Defendant Hurt submitted invoices, both valid and fraudulent, he was not extended any new or additional funds.

## FIRST NATIONAL

MAH/ANS first entered into a business manager plan with First National on December 20, 1995. No funds were obtained at that time. On January 20, 1996, MAH/ANS first factored invoices, obtaining $500,000.00 in new funds. [5]

On January 8, 1997, a new obligation was created under the business manager plan in the amount of $800,000.00. The original $500,000.00 business manager transaction was consolidated with an existing traditional simple interest loan in the amount of $300,000.00 to comprise the new $800,000.00 transaction. No new money was obtained as a result of this transaction.

---

[5] On this date, there were existing traditional simple interest loans outstanding, which continued to exist after the business manager plan was executed, but which were not part of the plan. Also, thereafter additional- traditional loans were made that also existed independent of the business manager plan.

Under the business manager plan, another transaction transpired on February 24, 1997. This transaction involved the consolidation of a number of existing traditional simple interest loans, which were then rolled into the business manager plan. The amount of this transaction was $600,000.00. Again, no new money was obtained as the result of this transaction.

**After February 24, 1997, the amount of the total obligation of MAH/ANS under the business manager plan remained constant.** The first fraudulent invoice was submitted to First National on February 27, 1997. Thus, the fraudulent invoices were not used to obtain any new funds, rather the total amount of the obligation having been fixed on February 24, 1997. Hurt continued until the end to submit new fraudulent invoices every 30/60 days thereafter, with the new paying off the old.[6]

## EXCHANGE BANK

MAH/ANS executed the business manager plan at Exchange Bank on January 5, 1996. At that time, $1,000,000.00 was obtained by factoring existing, valid invoices. This banking relationship existed parallel to the banking relationship of MAH/ANS with First National. Thereafter, on April 25, 1996, an additional $250,000.00 was obtained by factoring valid invoices, thus increasing the total obligation under the plan to $1,250,000.00. After April 25th, MAH/ANS obtained several new traditional simple interest loans, totaling $700,150.00, which were secured by collateral other than factored invoices. On February 1, 1997, the traditional simple interest loans were consolidated and rolled into the business manager plan with the result that they were now secured by factored invoices.

---

[6] Not every invoice submitted after February 27, 1997 was fraudulent. A large number were valid, the false ones being used to make up the shortfall in available funds to pay off all existing invoices. Also, even when fraudulent invoices were submitted, interest was paid on the total amount of the new fraudulent invoices (1 ½% per month or 3% for the 60 day cycle).

After February 1, 1997, the total obligation of MAH/ANS under the business manager plan did not change. The first fraudulent invoice was not submitted to Exchange Bank until March 7, 1997. Thus, as was the case with First National, the use of fraudulent invoices was not to obtain new funds, inasmuch as the total obligation, pursuant to the plan, was fixed as of February 1, 1997. After March 7, 1997 Hurt continued to submit fraudulent invoices every 60 days thereafter, with the new invoices paying off the old. [7]

What is evident from the facts above is that no new debt was ever incurred from the submission of fraudulent invoices to either bank. Additionally, there is no evidence to suggest that any additional funds were ever available to Defendant Hurt at the time the first fraudulent invoice was presented. Therefore, these were not traditional lines credit where Defendant Hurt was able to make more draws until a maximum amount was reached. Rather, by the time he had submitted the fraudulent invoices, the "notes" were frozen in time. To the contrary of the Probation Officer's analysis that these were lines of credit, since no new monies were ever obtained, this logically supposes that no new monies were available. However, if the logical supposition is insufficient to establish this fact, as stated earlier, the victim banks will also testify that the arrangement between the Defendant and their institution was not that of a line of credit transaction.

Finally, it is important for the Court to note that the fraudulent invoices did not collateralize the entire loans at any given time. In other words, if the fraudulent invoices had been totaled at any point, they would not have equaled the entire loan balance. Therefore, the statement made by the Probation Officer in Paragraph 15 of her report, which states that $3,350,000.00 (the total of the two "lines of credit") would have been lost had the "notes" been

---

[7] Not every invoice submitted after March 7th, was fraudulent, the ones that were being used to make up the "shortfall" in availed funds to pay off all existing invoices.

called, is not supported by any evidence. However, there is ample evidence to suggest that had the notes been called, the loss would have been far less than the "total of the lines of credit". Therefore, it is clear that Defendant Hurt did not intend or cause a probable loss of $3,350,000.00, or any amount even close to that figure, since the only credible loss to the victims is the amounts represented by those fraudulent invoices outstanding in the last 60-day cycle prior to the detection of the fraud.

All of these facts show that Defendant did not intend to cause any loss greater than the actual loss in this case. Additionally, the facts demonstrate that it was impossible for Defendant to defraud the banks of any more than the actual loss amount. Finally, the facts show that the loss calculation is exactly the same, whether an actual or intended theory is used. Applying the applicable law to these factual conclusions, it is clear that the actual loss calculation is the appropriate calculation to be used for Guideline purposes.

## II.     THE RELEVANT CONDUCT ENHANCEMENT IS INAPPLICABLE

In Paragraphs 15, 20 and 66 of the Pre-sentence Investigation Report, the Probation Officer makes reference to an enhancement of the Guideline computation for purposes of encompassing the totality of the Defendant's conduct. Specifically, she urges the Court to consider the "relevant conduct" and assess points for what might be "unpunished" conduct, without an enhancement. However, the Relevant Conduct provision of the Sentencing Guidelines, or §1B1.3 (a)(2), does not apply to the facts and circumstances of the instant case. It is clear that the Sentencing Commission did not intend the use of this provision to encompass the type of conduct where the amount loss remains the same, whether it is called actual or intended and no matter how many invoices were submitted or payments made to reach the amount.[8]

---

[8] The loss amount in this case is same under the "actual" loss theory as it would be calculated under the "intended" loss theory, since it is impossible that the Defendant could have intended more than the actual loss.

Relevant conduct is used in sentencing where a defendant is indicted for one count, but there is other conduct not indicted that caused a loss. For example, in an embezzlement case, there may be two or three transactions that resulted in losses of $10,000.00 each. However, there may be only one indictment for one $10,000.00 transaction. At sentencing, those additional losses and instances of conduct can be combined to enhance the punishment and reach all of the criminal conduct. Using the example above, relevant conduct could be used to make the sentencing on the one count embezzlement case actually total $30,0000.00, rather than one $10,000.00 transaction alone. By contrast, Defendant Hurt pled to two counts, one for First National and one for Exchange Bank, for all of the loss resulting from his conduct, rather than merely part of it. Defendant Hurt's guilty plea encompassed the entire scheme.

That relevant conduct provisions to do not apply to the instant case is demonstrated by the fact that there is no case law that reaches the type of conduct at issue here. Examination of the commentary to § 1B1.3 illustrates the type of case for which relevant conduct is applicable. Those cases include jointly undertaken criminal activity, solicitation, misprision, accessory after the fact, embezzlement, drug distribution or sale, mail fraud, et cetera. In those types of cases, a defendant can be indicted for a count that does not involve all of the loss occasioned by the criminal conduct. That is simply not the same with the case at bar, where the entire loss amount, whether actual or intended, is being used to determine the appropriate Guideline level in the first instance.

Finally, it is logical that since fraud that does not cause a loss does not receive an increase from the base level of 6, any conduct constitutes fraud and does not increase the loss amount should not be used to enhance the Guideline level. Here, each invoice that was paid by the Defendant, whether by cash or new invoice submission, did not cause a loss to the banks. In

other words, where fraudulent invoices were used, they did not increase the loss, but rather carried it forward.

The Probation Officer suggests that this Court depart upward to encompass all of Defendant Hurt's criminal conduct. Yet, due to the levels of sentence for the loss amount caused by fraud, the Sentencing Commission took the "encompass all conduct" argument into account when establishing those levels. It logically follows that any enhancement more accurately runs the risk of overstating the seriousness of the offense, than failing to encompass the conduct. Therefore, not only does the Probation Officer's argument defy logic, it appears to fly in the face the stated purpose of the guidelines.

## III.   CONCLUSION

For the foregoing reasons, Defendant prays this Court will find that the applicable loss theory in this case is the actual loss to victims, with that loss being calculated as the total amount of the outstanding invoices pledged within the last 60-days prior to the detection of the fraudulent conduct. Additionally, Defendant prays this Court will find that the Relevant Conduct provisions of the Sentencing Guidelines are not applicable to the type of conduct presented in this case.

**RESPECTFULLY SUBMITTED**, this _3_ day of September, 2002.



O. HALE ALMAND, JR.
Georgia Bar No. 013400

LAW OFFICES OF:
ALMAND & WIGGINS, P.C.
1922 Forsyth St
P O Box 1605
Macon GA 31202-1605
(478) 746-2237

## CERTIFICATE OF SERVICE

This is to certify that I have this day served the within and foregoing **DEFENDANT'S SENTENCING BRIEF** by mailing a true and correct copy of the same in the United States Mail, First Class, in a properly addressed envelope with sufficient postage affixed thereto to ensure delivery and via facsimile (478-621-2655), upon the following:

> **Paul McCommon,**
> **Assistant United States Attorney**
> **433 Cherry ST**
> **P O Box 1702**
> **Macon GA 31202-1702**

This _____ 3 _____ day of September, 2002.

_O. HALE ALMAND, JR._

ALMAND & WIGGINS
1922 FORSYTH ST
P.O. BOX 1605
MACON, GEORGIA 31202-1605
(478) 746-2237
(478) 746-2434 (fax)

H:\Law Office\Clients\157-12115\PLD\Hurt Sentencing Brief(2).doc



DEFENDANT'S
EXHIBIT
"H"

IN THE UNITED STATES DISTRICT COURT FOR THE
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

UNITED STATES OF AMERICA

v.

MARK A. HURT,                                    DOCKET #5:02-CR-16-001

     Defendant.

---

## OBJECTION TO AND ADDITIONAL INFORMATION FOR THE
## PRESENTENCE INVESTIGATION REPORT

Defendant entered a plea of guilty to a two-count Information on April 18, 2002 to a violation of 18 U.S.C. § 1344. The Information alleged that the Defendant committed bank fraud against the Exchange Bank of Milledgeville, Georgia and the First National Bank of Baldwin County. The plea was pursuant to a written plea agreement with the United States Attorney. This plea agreement was finalized after extensive negotiations between defense counsel and Assistant United States Attorney Paul McCommon. At the time of the plea, both counsel made numerous statements and representations to the Court. These statements and representations are incorporated herein and made a part of this document. (A copy of the transcript of the plea has been ordered and will be submitted upon receipt). Defendant now makes the following objections to and submits the additional information for the Presentence Investigation Report of July 18, 2002, as follows:

## I    Objection to Presentence Investigation Report

### A.    Objection to Statement of Offense Conduct

#### 1.    Paragraph 8

Defendant specifically objects to the statement of facts as contained in Paragraph 8 of the Presentence Investigation Report in that the nature of the financial transaction has not been described correctly. This document contains a Statement of Fact, which is incorporated herein and made a part of this document. Specifically, Paragraph 8 of the Presentence Investigation Report states: "[I]n March of 1997, business accounts and a line of credit for $700,000 was established in the name of ANS, Inc., also with Exchange Bank." Exhibit "B" to this document explains the transaction. Further, what occurred was that on February 1, 1997, three traditional loans in the amounts of $50,000 made on 8/16/96, $150,075 made on 11/1/96, and $500,750 made on 11/29/96, were combined into one loan under the Business Manager Agreement. Although the Probation Officer's statement that "These agreements allowed the defendant to draw against the line of credit by presenting accounts receivable invoices to the bank as collateral" is correct as far as it goes, actually there were only two transactions that occurred with Exchange Bank pursuant to the Business Manager Agreement; the first being on January 5, 1996, in which $1,000,000 was obtained by submission of invoices. The invoices submitted at that time were valid and correct. The second transaction pursuant to the Business Manager Agreement occurred, as previously stated, on February 1, 1997, when

2

three existing traditional, simple interest loans were combined into a $700,000 debt under the Business Manager Agreement.

### 2. Paragraph 9

Defendant specifically objects to the statement of facts as contained in Paragraph 9 of the Presentence Investigation Report and the statement by the Probationer Officer that "Beginning February 11, 1997, Hurt made 56 draws on his line of credit by submitting false and fictitious accounts receivable invoices." What actually occurred was that beginning on February 11, 1997, Hurt caused MAH (ANS) to submit false and fictitious accounts receivable invoices as collateral to replace existing accounts receivable invoices which, prior to February 11, 1997, were all valid invoices. After February 11, 1997, in addition to the 56 false and fictitious accounts receivable invoices that were submitted, valid invoices were also submitted in the same manner as were the false and fictitious invoices.

### 3. Paragraph 10

Defendant specifically objects to the statement of facts as contained in Paragraph 10 of the Presentence Investigation Report. However, due to the length of this response, please see Defendant's Statement of Fact contained elsewhere in this document and Exhibit "A" attached hereto.

### 4. Paragraph 11

Defendant specifically objects to the statement of facts as contained in Paragraph 11 of the Presentence Investigation Report. Defendant did not make "46 draws on his line of credit by submitting false and fictitious accounts

3

receivable invoices." As stated previously in the objection to Paragraph 9 and later in the Statement of Facts, Defendant submitted 46 false and fictitious accounts receivable invoices, however not for the purpose of making draws. Rather, the invoices were submitted for the purpose of substituting the invoices as collateral for those, which had become due under the thirty-day rotation cycle.

### 5. Paragraph 12

Defendant specifically objects to the statement of facts as contained in Paragraph 12 of the Presentence Investigation Report, which states, "[T]he total amount of loss caused by the defendant to both banking institutions as a result of fraudulently submitted accounts receivable is $4,206,790.60." This amount was computed by compiling the total amount of false invoices. However, this method of calculation does not calculate loss as that term is used in the Federal Sentencing Guidelines and as interpreted by the Courts, as will be explained later in the sections that follow.

### 6. Paragraph 13

Defendant objects to the statement of facts as contained in Paragraph 13 of the Presentence Investigation Report that states "Exchange Bank has recovered some of the loss through the sale of collateral totaling $164,500, legitimate accounts receivable totaling $49,911.52 and re-payment by the defendant of $225,231.02." Specifically, through sale of collateral and collection of legitimate accounts receivables, Exchange Bank has, in fact, collected $284,500, rather than $225,231.02. Defendant has made voluntary payments to

both First National Bank of Baldwin County and the Exchange Bank, beginning in April of 1999 through August of 2002, totaling $460,248.

### 7.     Paragraph 14

Defendant specifically objects to the statement of facts as contained in Paragraph 14 of the Presentence Investigation Report relating to the amounts collected by Exchange Bank.  Please see objections stated to Paragraph 13 above.

### B.     Objection to Offense Level Computation

### 1.     Paragraph 21

Defendant specifically objects to the offense level characterization as described in Paragraph 21 in that the offense level is based on a loss of $4,206,790.60.  See specific discussion in Objection to Paragraphs 12, 13 and 14 of this document.

### 2.     Paragraph 23

Defendant specifically objects to the assessment of a four-level increase. As stated in Paragraph 23 of the Presentence Investigation Report, the adjustment is based on a loss figure of $4,206,790.60, which, as shown throughout this document, is an incorrect figure.

### 3.     Paragraph 48

In regards to Paragraph 48 of the Presentence Investigation Report, the following additional information is provided to clarify information regarding Mark Hurt's current financial statement.  Because of the way the request was worded requesting Mark Hurt's personal financial information (that was initially provided

to the U.S. Probation Office), Mr. Hurt, in an attempt to be overly broad in including all assets in which he arguably had an interest, included everything whether titled in his name, his wife or other family members regardless of the absence of a genuine property or pecuniary interest in certain items. For example, under "Cash", the two money market accounts totaling $36,000, the Smith-Barney investments totaling $100,000 and the certificate of deposit at the Bank of Dudley totaling $60,000 are not owned by Mark Hurt but rather are owned by a closely held corporation, MMHG, Inc. in which Mark's wife Teresa Hurt, owns 99% of the outstanding stock. These three items are owned by the corporation for the benefit of Mark Hurt's children rather than Mark Hurt.

Mr. Hurt's residence located at 690 Richmond Hill Court, Macon, Georgia, while listed as an asset, is not owned by him. This property is in his wife's name and has been so titled since its purchase.

Mr. Hurt also listed property located at · 102 West Lakeview Court, Milledgeville, Georgia. While this property is in MMHG, Inc.'s name, this property was purchased for the purpose of moving the Hurt family residence from Macon to Milledgeville, where Mr. Hurt's business office is located. One of the two homes, either the Macon residence at 690 Richmond Hill Court or the Milledgeville home at 102 West Lakeview Court will be sold and the one remaining will be the residence for the Hurt family.

Also listed as an asset was the stock in Progressive Communications, valued at $360,000. However, Mr. Hurt only listed this as an asset because, as he read and understood the forms, all assets that were property of immediate

family should be included. Upon reflection and clarification from counsel, Mr. Hurt is providing information believed to be more precisely responsive to the request in that the stock in Progressive Communications is owned by a trust which is set up for the benefit of Mark Hurt's children. This trust has an independent trustee and Mark Hurt has no interest in the ownership shares of Progressive Communications. Hence, like many of the items discussed herein, it should not be listed or viewed as an asset of Mark Hurt.

By way of additional information to provide a more accurate reflection of Mr. Hurt's current financial statement, the financial data previously provided did not include a $1,000,000 judgment which was voluntarily entered into by Mark Hurt for the benefit of Exchange Bank and First National Bank, both in Milledgeville, Georgia. This voluntary consent judgment was provided as evidence of Mr. Hurt's good faith intent to repay indebtedness to the Exchange Bank and the First National Bank of Milledgeville and to affirmatively obligate himself to do so. This $1,000,000 consent judgment has not been fully satisfied and is a current obligation for which Mr. Hurt pays monthly to insure that the debt to Exchange Bank and the First National Bank of Milledgeville is satisfied, as more fully discussed hereinbelow.

Page 11, footnote 11: additional information is provided regarding the payments that Mark Hurt is currently making to the Exchange Bank and the First National Bank of Milledgeville to fully understand the contributions being made to them and the impact on Mark Hurt's personal financial situation. While Mr. Hurt agreed in December, 2000, to begin making payments to First National Bank and

Exchange Bank to satisfy outstanding indebtedness, it is important to note first that, prior to reaching any agreement with the two banks and prior to voluntarily entering into a consent judgment for $1,000,000 against himself personally, Mr. Hurt began making payments to First National and the Exchange Bank as early as April, 1999, not too long after the financial demise and collapse of his companies as a result of the factoring program discussed herein. Second, not only did Mr. Hurt begin making payments in December of 2000, but as evidence of his good faith and true intent to satisfy the indebtedness with the bank, Mr. Hurt made a $200,000 initial payment in December, 2000 with $100,000 being paid each to First National Bank and the Exchange Bank. Since December, 2000, Mr. Hurt has consistently paid $8,000 per month to the banks with the exception of December, 2001, in which Mr. Hurt voluntarily paid an additional $17,000 to the banks (in addition to his regular $8,000 monthly payment) for a total payment of the month of December, 2001, of $25,000. Mr. Hurt has continued to pay the banks $8,000 per month, through and including the present time. Please see attached hereto as Exhibit "A," a list of payments to First National Bank and Exchange Bank beginning in April, 1999, through and including August, 2002. Also noted on this exhibit are additional funds remitted to the banks through the surrender and sale of collateral securing the loans to Mark Hurt and his business.

## C.   Factors that may Warrant Departure

The Probation Officer states that she has not identified new factors that might warrant a departure from the proscribed sentencing guideline range.

Defendant suggests that based upon the information contained in this response to the Presentence Investigation Report, and additional information that will be submitted from the sentencing hearing, a downward departure would be appropriate. This suggestion is reinforced by the specific language of the Plea Agreement, and the statements made by counsel in the plea hearing, as contained in the transcript which is forthcoming.

## II.   STATEMENT OF FACTS IN SUPPORT OF OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT AND ADDITIONAL FACTS

In the early 1990s, the Defendant Mark Hurt discovered a niche in the computer market which involved the wiring of commercial buildings and public school buildings for computer networking and telecommunications facilities. Initially, MAH, Inc., a small Georgia corporation, was formed to conduct this business. Hurt was the President and sole shareholder. Over time after the market expanded, MAH, Inc. ventured into the sale and installation of computers and establishment of computer networks. Growth led to the formation of another small Georgia corporation named ANS, Inc. which was formed to jointly exploit the market with MAH. Hurt was also President and sold shareholder of ANS. Each corporation operated in a similar manner.

MAH (ANS) primarily operated as a subcontractor on major projects. This method of operation required MAH (ANS) to fund both labor and materials during the in-process phase of construction.   Upon completion of the projects, the owner/general contractor was invoiced, after which MAH (ANS) expected payment.  This method of operation required tremendous amounts of working capital to fund jobs in-process, which capital was obtained from First National

Bank of Baldwin County and later from the Exchange Bank of Milledgeville, Georgia.

The loans obtained by MAH (ANS) were a combination of loan types, the first type being traditional, simple interest, secured loans collateralized by real estate, equipment, signature, or assignment of specific contracts, for either a one or two-year term. On due dates, the notes were either paid, including interest, or renewed by payment of interest only. Interest rates varied between 8% and 9-1/2%. The other type loans involve what, in essence, was accounts receivable factoring. This type program was instituted by both the First National Bank of Baldwin County and Exchange Bank of Milledgeville, Georgia. Although each bank had a different name for its program,[1] they operated in the same manner. The purpose of these programs were to enhance profits by charging higher interest rates to the customer and obtaining greater security for the banks, because of requirements to hold back reserve amounts against losses, and the recourse provisions. The hold-back was occasioned by the fact that the accounts receivable loans were with recourse, which allowed banks to collect from its customers whenever an invoice was not paid by the accounts receivable debtor.

Almost from the beginning, MAH (ANS) obtained bank financing through traditional loans. The format of the traditional loan was that the borrower was MAH (ANS), but the loan was guaranteed by Mark Hurt. The loan was for a stated period of time, usually one or two years. They were simple interest loans

---

[1] At First National Bank it was called Cash Flow Manager and at Exchange Bank it was called Business Manager Plan.

and the interest rate varied between 8% and 9-1/2%, depending upon the market interest rate at the time the loan was made. On the due date of the loan, it was either paid in full, including interest, or it was renewed by payment of interest only (perhaps with some principal reduction). Through these loans, MAH (ANS) was able to obtain the full amount of the loan to use for business purposes. Interest was not payable until the note became due. Thus, this type of loan did not reduce the amount of funds available because of requirements for prepayment of interest and hold back.[2] At both First National Bank of Baldwin County and the Exchange Bank of Milledgeville, Georgia, a number of traditional loans were obtained in substantial amounts, which were later rolled into the accounts receivable factoring program at the insistence of the banks.[3]

## Accounts Receivable Factoring

This program was designed specifically to handle accounts receivable financing. Under these programs, a maximum line of credit was established, based on a master note for the total amount available for invoice factoring. Under these programs, a participant was allowed instant access to his receivables by submitting invoices up to the allowable limit of the master note. The bank had recourse on these advances. The interest rate charged for this program was 18%, which equals 1-1/2% per month. The bank would deduct up-front two months' interest (3%), plus a 10% reserve to be held against the recourse obligation. Thus, for example, for an invoice totaling $100,000 that was factored, MAH (ANS) received only $87,000. The Exchange Bank of Milledgeville, Georgia established a sixty (60) day cycle, in

---

[2] This is to be contrasted with the manner in which accounts receivable factoring worked, as will be described hereinafter.

11

which factored invoices must be paid. At the end of the 60-day period, the bank would demand full payment of the invoice or substitution of the collateral with a new current invoice, which would start a new 60-day period (without regard to whether MAH (ANS) had been paid on the invoice). Each time this occurred, the bank, again, charged the three (3%) percent advance interest fee and also maintained the ten (10%) percent reserve. The program at the First National Bank of Baldwin County worked the same, except a thirty (30) day cycle was established instead of the 60-day cycle that was used by Exchange Bank of Milledgeville, Georgia. Thus, MAH (ANS) was required every 30/60 days to either pay the invoice in full or submit new invoices to replace the old invoice, regardless of whether the accounts receivable debtor had paid the invoice to MAH (ANS).

MAH's (ANS's) participation in the accounts receivable factoring program at First National Bank of Baldwin County began in January of 1996 when $600,000 was obtained through the program. This $600,000 amount was made up of $532,855 of old traditional loans that were rolled into the program and $67,145 advance of new money. In January of 1997, an additional $800,000 was placed in the accounts receivable factoring program by MAH (ANS). This amount was based on traditional loans that had previously been made and which were now rolled into the accounts receivable factoring program. Thus, out of $1.4 million owed by MAH (ANS) through the program, all but $67,145 was based on converting traditional loans at nine and one-half (9-1/2%) percent interest into what, in essence, were loans at eighteen (18%) percent interest. (See Exhibit "A")

---

[3] See Exhibits "A" and "B" attached hereto.

At the Exchange Bank of Milledgeville, Georgia, in January of 1996, MH obtained $1,000,000 in new funds pursuant to the accounts receivable factoring program. Thereafter, MAH (ANS) increased this amount to $1,250,000 on April 25, 1996. Thereafter, MAH (ANS) negotiated and obtained, on various dates in 1996, $700,000 in traditional loans at a nine and a half (9-1/2%) percent interest rate. These, at the insistence of the Exchange Bank of Milledgeville, Georgia, were converted or rolled, on February 1, 1997, into the accounts receivable factoring program at an interest rate of eighteen (18%) percent. (See Exhibit "B")

As of February 1, 1997, no false or fictitious invoices had been submitted. Prior to that date, loans on invoices or other collateral submitted to the banks, securing either traditional loans or accounts receivable factoring, were valid.

As will be explained below, by February, 1997, various factors "came into play," which made it impossible for MAH (ANS) to pay the invoices or substitute new valid invoices every thirty or sixty days. These factors included substantial business losses relating to the failure of major contractors, including the United States Post Office, to pay for work done or equipment provided. For example, the United States Post Office reneged on a $1.2 million contract. Another primary factor was the thirty or sixty-day cycle in which payments or new invoices had to be submitted without regard to whether MAH was paid by the accounts receivable debtor. The interest rate being doubled for the accounts receivable factoring also imposed a tremendous burden, as did the 10% hold back that was taken by the banks on each invoice.

As can be seen from the discussion above and an examination of Exhibits "A" and "B," all useable funds had been advanced by December of 1996. Thereafter, no new funds were obtained by MAH (ANS); rather MAH (ANS) could only manage the existing debt as best it could. Because of these pressures and the lack of funds, the scheme to submit false or fraudulent invoices was created, as will be explained below.

**Factoring Scheme**

As stated above, beginning mid-February of 1997, MAH found itself in a position that it could not meet its obligations under the accounts receivable factoring programs. Essentially, Mark Hurt, as President of the corporation, had three choices: one, pay, as required, which he could not do; two, go to the banks and advise them of the true financial condition; or, three, initiate the scheme for submission of fraudulent invoices. Hurt chose the third option, which constituted a clear violation of the law and obvious fraud. During this period, some invoices were paid, some were replaced with valid invoices, but a large number totaling over $4 million were replaced by fraudulent or false invoices.

Under the requirements of the factoring program, at the end of the 30 or 60 day period, an invoice had to be paid in full or a new current invoice submitted in replacement of the old invoice, resulting in the old invoice being marked paid. The amount of the debt did not change by the submission of the new invoice, whether valid or fraudulent. It remained the same. For example, if a $100,000 invoice became due and MAH (ANS) submitted a new fraudulent invoice for $100,000 to replace the old invoice, it still had to pay the interest in cash. The

10% reserve requirement was maintained. The $100,000 debt did not change; it remained the same, but the bank received its interest of $3,000 and kept $10,000 in reserve. The invoices were analogous to collateral because they stood for the debt and the bank had the right to collect on them, it if it chose, which it never did and the bank also had recourse against MAH for any invoice that was not paid by the accounts receivable debtor.

Because of the way the factoring program was structured with the advanced payments of interest on the 10% withheld and the amount advanced, the 3% interest has to be added to the per annum interest rate. Although the stated interest rate was $18% per annum (1-1/2% per month), the actual annual percentage rate was either 21% or 42% per annum. The impact of this rate was substantial on MAH's (ANS's) ability to maintain its obligation under the accounts receivable financing program. If the account was not paid by the accounts receivable debtor within the applicable time frame, the effect of paying interest in advance, plus paying interest on the 10% reserve hold back by the bank, drove the interest rate up to 21%.

In some cases, customers paid invoices in a normal 30-day cycle. In such cases, the 3% discount fee was not prorated or refunded. If an invoice was paid within thirty days, the APR was forty-two (42%) per annum; three (3%) percent for thirty (30) days instead of 3% for sixty (60) days. It is estimated that MAH (ANS) during the period January 1, 1996 to January, 1998 actually paid $1,113,750 in interest because of the accounts receivable financing program.[4]

---

[4] This information is not provided to excuse the conduct of Mark Hurt; there is no excuse. However, it does serve to describe the unique circumstances of this case, which defendant

Had the loans remained structured as traditional loans, it is estimated that the interest paid would have totaled $556,875. The funds obtained through use of fraudulent invoices were not utilized by Mark Hurt for personal enrichment. All funds obtained were utilized in the business in an attempt to keep MAH and ANS viable and operating.[5]

By January of 1998, the scheme had snowballed, and was totally out of control, and could not be continued. However, during the period of time in which the false invoices were submitted to secure the obligations of MAH (ANS), the principal amount of the loan or obligation to the bank did not change; it remained the same as it had been prior to the submission of the first false or fraudulent invoice. Thus, the fraudulent scheme did not increase or change the banks' exposure in terms of what it was owed, but rather induced the banks to forbear in a collection effort that would have inevitably followed had Hurt chosen Option 2 mentioned above and confessed to the bank the true financial situation of MAH (ANS), prior to submitting the false or fraudulent invoices.[6]

III.     **Applicable Law and Determination of Loss**

To determine loss under USSG § 2F1.1, Application Note 8(B) to the commentary governs the method of calculating loss. This note states:

> "[I]n fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan **not** repaid at the time the offense is discovered,

---

suggests warrants a downward departure. Circumstances "placed defendant in a box" and he utilized the wrong method to "get out of the box."
[5] See Footnotes 3 and 4.
[6] Any loss, of course, but for the forbearance, will certainly be a loss cognizable under USSG § 2F1.1.

reduced by the amount the lending institution has recovered (or can expect to recover from any assets pledged to secure the loan). However, where the intended loss is greater than the actual loss, the intended loss is to be used." (Emphasis Added)

Defendant's conduct here places the analysis of the loss squarely within the provisions of this note to the commentary, because he submitted fraudulent invoices to collateralize a loan. In essence, the fraudulent invoices constituted a misstatement or misrepresentation of the assets. Under the peculiar circumstances of this case (a fact pattern for which no case law can be located), to determine the loss to the banks, you must look to the amount represented by the unpaid invoices at the time the fraud was uncovered.

The fraudulent invoices are not debt. But as the Probation Officer stated in Paragraph 8 of the Presentence Investigation Report, they are collateral. The debt already existed at the time the first fraudulent invoice was submitted. The fraudulent invoices did not increase the amount of the existing debt. The debt was not based upon fraud; it was valid at the time it was incurred. The fraud occurred once it became necessary to substitute collateral on a regular basis, which was done through the use of false invoices.

In accordance with the banks' procedures governing replacement of invoices on the 30/60 day cycle, whenever a new invoice was submitted to replace the old, the old was considered paid. The new invoice stood as collateral in place of the old invoice.[7] The 30/60 day cycle mandated that invoices be replaced within that timeframe. Therefore, at the time the fraud was uncovered,

---

[7] The paid invoices were like paid notes. If a note exists and it is paid by renewal, the old note is marked paid and the renewal note stands in its place. The amount of the debt did not change; it remained the same.

only those false invoices that were submitted within the last sixty days would be unpaid.

After explaining the commentary to Federal Sentencing Guideline 2(f)1.1, the current law requires that in the type of case where a defendant fraudulently obtains loans by misrepresenting the value of assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered or can expect to recover from any assets pledged to secure the loan. U.S. v Renick, 273 F.3d 1009, 1027 (11th 2001). However, from a review of the Presentence Investigation Report in Hurt's case, it is evident that instead of calculating loss as the amount of the loan outstanding at the time the offense was discovered, and reducing that number by the liquidation of the assets recovered, the loss is being calculated as a compilation of the numerous invoices which were presented to the banks as collateral. The law in this circuit does not allow this type of loss calculation.

Rather, the law specifically rejects calculating fraud loss based on entire face amounts of loan applications or extended credit lines or other type of financial lending practices. U.S. v Wilson, 993 F.2d 214, 218 (11th Cir. 1993); U.S. v Tatum, 138 F.3d 1344 (11th Cir. 1998); U.S. v Mancuso, 42 F.3d 836 (4th Cir. 1994); U.S. v Menichino, 989 F.2d 438 (11th Cir. 1993). In Wilson, the Court of Appeals held that a district court erred in calculating loss based on entire face amounts of fraudulently induced loans. 993 F.2d at 218. In Menichino, the court stated that in cases involving misrepresentation of assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the

amount the lender could recover from collateral. 989 F.2d 438 (11th Cir. 1993). In Mancuso, the amount of loss was determined to be equal to the amounts of actual checks, which had been diverted from the bank in payment of invoices submitted for collateral. 42 F.3d at 850. This was determined to be the amount of the actual loss, rather than the total amount of a revolving line of credit. Id.

A major distinction between the facts of this case and the fraudulent loan application cases contained in case law is the fact that those cases involved situations where the assets were represented to obtain a loan. Here, in essence, the assets were misrepresented to obtain forbearance on loans that already existed. Thus, the fraud is not the total amount of the loan nor the total amount of the fraudulent invoices that were submitted; rather, simply stated, it is the total amount of the unpaid invoices at the time the fraud was uncovered. The total amount of unpaid invoices were those that were submitted within the last sixty days prior to the time the fraud was uncovered.

One final factor to be considered is the last sentence of Application Note 8, which provides that where the intended loss is greater than the actual loss, the intended loss is the measure of loss to be used. However, the intended loss can be no greater than the actual loss for the following reason. At the time Hurt submitted the fraudulent invoices to secure the debt, no additional monies were extended or obtained. Additional monies were not extended because Hurt's only purpose for submitting the fraudulent invoices was to continue to secure the previously validly obtained loans. Therefore, realistically, there is no intended

loss. Where there is no intended loss, the only loss calculation the law allows is the actual loss to the financial institutions. As stated above, the actual loss in Hurt's case would be the amount of the unpaid invoices outstanding at the time the fraud was uncovered, reduced by any assets, which have been recovered and liquidated against the loans. Therefore, the loss occasioned by the fraud cannot be the figure that is represented by the Presentence Investigation Report.

## IV. Submission to the Court

It is requested that this Objection to and Additional Information for the Presentence Investigation Report be submitted to the Court, along with any amendments to the Presentence Investigation Report that may be made by the Probation Officer.

RESPECTFULLY SUBMITTED, this 20th day of August, 2002.

O. HALE ALMAND, JR.

LAW OFFICES OF:
ALMAND & WIGGINS, P.C.
1922 Forsyth St
P O Box 1605
Macon GA 31202-1605
(478) 746-2237
(478) 746-2434 (fax)

# EXHIBIT "A"

| DATE | COLLATERAL O[1]/R[2] | LOAN # TRADITIONAL[3] | NEW MONEY | NEW NOTE RENEWAL | OLD NOTE PAID BY RENEWAL | BALANCE |
|---|---|---|---|---|---|---|
| **MAH** | | | | | | |
| 05/30/95 | O | 900815201-T | 50,000 | | ( 50,000) | |
| 03/13/96 | R | 900511706-T | 50,000 | | ( 50,000) | |
| 05/09/96 | O | 901132102-T | 300,000 | | ( 300,000) | |
| 11/29/96 | R | 901132101-T | 53,755 | | ( 53,755) | |
| 11/29/96 | R | 900815207-T | 79,100 | | ( 79,100) | |
| 02/24/97 | O | 901132104-T | 67,145 | 532,855 | ( 600,000) | |
| 03/01/98 | R | BMA[4] | | 600,000[5] | | 600,000 |
| | | | | | | |
| **ANS** | | | | | | |
| 01/02/96 | O | BMA | 500,000[6] | | ( 500,000) | |
| 08/27/96 | O | T | 300,050 | | ( 300,050) | |
| 11/29/96 | R | 901132102 | | 300,000 | ( 300,000) | |
| 01/08/97 | R | 900815206 | | 800,000[7] | ( 800,000) | |
| 01/01/98 | R | 900815206 | | 800,000[8] | | 800,000 |
| | | | | | | |

[1] O- Original Note
[2] R – Renewal Note
[3] T - Traditional Loans rolled into Business Management Agreement –no additional funds obtained
[4] BMA – Business Management Agreement
[5] Traditional loans rolled into BMA – no additional funds obtained
[6] Initially factoring
[7] Traditional loans for $500,000 and $300,050 rolled into BMA
[8] Renewal of BMA

# EXHIBIT "B"

| DATE | COLLATERAL O[1]/R[2] | LOAN # TRADITIONAL[3] | NEW MONEY | NEW NOTE RENEWAL | OLD NOTE PAID BY RENEWAL | PAID |
|------|------|------|------|------|------|------|
| **EXCHANGE** | | | | | | |
| 01/05/96 | O | BMA[4] | 1,000,000 | | (1,000,000) | RENEWED 04/25/96 |
| 04/25/96 | R[5] | BMA | 250,000 | 1,000,000 | (1,250,000) | RENEWAL TO LOC |
| 08/16/96 | O | T | 50,000 | | ( 50,000) | RENEWAL TO LOC |
| 11/01/96 | O | 568896501 – T | 150,075 | | ( 150,075) | RENEWAL #6502 |
| 11/29/96 | R | 568899901 – T | 500,750 | | ( 500,750) | RENEWAL TO LOC |
| 12/03/96 | R | 568896502 – T | | 150,075 | ( 150,075) | RENEWAL TO LOC |
| 02/01/97 | O | BMA | | 700,000 | (700,000) | RENEWAL TO LOC |
| 08/14/97 | R | BMA | | 1,250,000 | | |
| 08/14/97 | R | BMA | | 700,000 | | |

[1] O – Original Note
[2] R – Renewal Note
[3] T – Traditional Loans rolled into Business Management Agreement – no additional funds obtained
[4] Business Manager Agreement
[5] Old loan rolled into BMA

O. Hale Almand, P.C. d/b/a
Law Offices
**ALMAND & WIGGINS\***
1922 Forsyth Street
P.O. Box 1605
Macon, Georgia 31202-1605

O. Hale Almand, Jr.
(hale@halealmand.com)
Bond H. Almand
(bond@halealmand.com)
Amy R. Reese
(amy@halealmand.com)
Brian C. Ranck
(brian@halealmand.com)

Telephone (478) 746-2237

Facsimile (478) 746-2434

August 22, 2002

**(VIA HAND DELIVERY)**
Ms. Elizabeth K. Thomas
U.S. Probation Office
433 Walnut ST
Macon GA 31202-1736

RE: Mark Hurt

Dear Beth:

Thank you for your telephone call today. Attached hereto is a list of payments made by Mr. Hurt to both First National Bank and Exchange Bank, as well as a list of some of the collateral that was sold by the banks. Total cash obtained was $284,500 from the sale of the collateral; total payments made by Mr. Hurt were $460,248. This should have been marked as Exhibit C to the Objection to and Additional Information for the Presentence Investigation Report. Please mark "C" at the text of your copy of the report that was referenced as Exhibit "A" in the last paragraph before Section C begins on Page 8.

Also attached hereto are two analyses done by Scotty Jones, a CPA in Dublin, Georgia. These analyses were done after the examination of invoices that were listed in the Information that was originally provided as part of the plea agreement. These reflect the handling of the invoices within the 30/60 day cycle. Of course, this analysis does not include the additional invoices that were obtained by the government after the date of the original Information.

As I told you, the reason for the expanded information in the financial section of our report was because Paul McCommon expressed some concern about the assets of Mr. Hurt. For that reason, I asked John Kennedy, who has been working with me, to analyze the assets in light of those comments. We, of course, realize that much of what we added in our information was already provided in your report. It was not intended as an objection or a criticism of the work you did, but merely to try to tell the entire story as we determined it to be from our investigation, primarily for the benefit of Mr. McCommon.

Please call if I can provide anything else.  Thank you, I am

Sincerely,

O. HALE ALMAND, JR.

OHAjr:pmg
Enclosures

cc:  John Kennedy, Esquire
     Mark Hurt

"C"

Collateral Foreclosed In 1998

| | |
|---|---|
| $83,000 | Accounts Receivable collected by First National |
| $37,500 | Brown & Williamson check collected by Exchange Bank |
| $9,000 | Check replaced by Mark to Exchange Bank |
| $40,000 | NYSE stock owned by Mark Hurt liquidated by Exchange Bank |
| $105,000 | Duke Airplane liquidated by Exchange Bank |
| $30,000 | Furniture purchased by Progressive Communications from Exchange Bank |
| **$284,500** | **Total Cash Obtained for Collateral** |

**Payments to First National & Exchange through Merrill & Stone Trust Account**

| | | |
|---|---|---|
| $2,435 | Apr-99 | |
| $2,435 | May-99 | |
| $1,729 | Jun-99 | |
| $4,890 | Jul/Aug-99 | |
| $3,981 | Sep-99 | |
| $4,250 | Oct-99 | |
| $2,808 | Nov-99 | |
| $6,702 | Dec-99 | |
| $0 | Jan-00 | |
| $4,973 | Feb-00 | |
| $3,250 | Mar-00 | |
| $3,263 | Apr-00 | |
| $3,304 | May-00 | |
| $4,498 | Jun-00 | |
| $4,975 | Jul-00 | |
| $3,620 | Aug-00 | |
| $3,875 | Sep-00 | |
| $3,995 | Oct-00 | |
| $10,265 | Nov/Dec-00 | |
| $200,000 | Dec-00 | **$100k to First National & $100k to Exchange |
| $8,000 | Jan-01 | |
| $8,000 | Feb-01 | |
| $8,000 | Mar-01 | |
| $8,000 | Apr-01 | |
| $8,000 | May-01 | |
| $8,000 | Jun-01 | |
| $8,000 | Jul-01 | |
| $8,000 | Aug-01 | |
| $8,000 | Sep-01 | |
| $8,000 | Oct-01 | |
| $8,000 | Nov-01 | |
| $8,000 | Dec-01 | |
| $25,000 | Dec-01 | **$15,000 to Exchange & $10,000 to First National |
| $8,000 | Jan-02 | |
| $8,000 | Feb-02 | |
| $8,000 | Mar-02 | |
| $8,000 | Apr-02 | |
| $8,000 | May-02 | |
| $8,000 | Jun-02 | |
| $8,000 | Jul-02 | |
| $8,000 | Aug-02 | |
| **$460,248** | **Total Paid Through Merrill & Stone Trust** | |
| | | |
| **$744,748** | **Total Payments** | |

**MAH, INC. AND AUTOMATED NETWORK SYSTEMS, INC.**
FIRST NATIONAL BANK
DISPOSITION OF QUESTIONED INVOICES

| | | Date Submitted | Amount | Discount Fee (3%) | Reserve Amount (10%) | Net Proceeds of Loan | Proceeds Not Documented as Paid | Date Paid | Document Number(s) |
|---|---|---|---|---|---|---|---|---|---|
| 02/26/97 | 970006 NISE EAST | 2/27/97 | $ 60,996.00 | $ 1,829.88 | $ 6,099.60 | $ 53,066.52 | $ - | 6/06/97 | 1 - 2 |
| 02/26/97 | 970007 NISE EAST | 2/27/97 | $ 200,000.00 | $ 6,000.00 | $ 20,000.00 | $ 174,000.00 | $ - | 6/06/97 | 1 - 2 |
| 02/28/97 | 970010 UTILITY CONSTRUCTION | 2/28/97 | $ 88,982.00 | $ 2,669.46 | $ 8,898.20 | $ 77,414.34 | $ - | 6/06/97 | 3 - 4 |
| 06/05/97 | S930056 GOVERNMENTAL AFFAIRS | 6/06/97 | $ 93,600.00 | $ 2,808.00 | $ 9,360.00 | $ 81,432.00 | $ - | 11/10/97 | 5 - 6 |
| 06/05/97 | S930051 TELECOMMUNICATION SERVICES | 6/06/97 | $ 150,000.00 | $ 4,500.00 | $ 15,000.00 | $ 130,500.00 | $ - | 10/07/97 | 7 - 8 |
| 11/05/97 | S980468 GA DEPT OF TECH/ADULT ED | 11/05/97 | $ 24,965.00 | $ 748.95 | $ 2,496.50 | $ 21,719.55 | $ - | 1/27/98 | 9 - 10 |
| 11/05/97 | S980469 GA DEPT OF TECH/ADULT ED | 11/05/97 | $ 24,965.00 | $ 748.95 | $ 2,496.50 | $ 21,719.55 | $ - | 1/27/98 | 9 - 10 |
| 11/05/97 | S980470 GA DEPT OF TECH/ADULT ED | 11/05/97 | $ 24,965.00 | $ 748.95 | $ 2,496.50 | $ 21,719.55 | $ - | 1/27/98 | 9 - 10 |
| 11/05/97 | S980471 GA DEPT OF TECH/ADULT ED | 11/05/97 | $ 24,965.00 | $ 748.95 | $ 2,496.50 | $ 21,719.55 | $ - | 1/27/98 | 9 - 10 |
| 11/05/97 | S980472 GA DEPT OF TECH/ADULT ED | 11/05/97 | $ 24,965.00 | $ 748.95 | $ 2,496.50 | $ 21,719.55 | $ - | 1/27/98 | 9 - 10 |
| 11/05/97 | S980473 GA DEPT OF TECH/ADULT ED | 11/05/97 | $ 24,965.00 | $ 748.95 | $ 2,496.50 | $ 21,719.55 | $ - | 1/27/98 | 9 - 10 |
| 11/05/97 | S980474 GA DEPT OF TECH/ADULT ED | 11/05/97 | $ 24,965.00 | $ 748.95 | $ 2,496.50 | $ 21,719.55 | $ - | 1/27/98 | 9 - 10 |
| 11/05/97 | S980475 GA DEPT OF TECH/ADULT ED | 11/05/97 | $ 24,965.00 | $ 748.95 | $ 2,496.50 | $ 21,719.55 | $ - | 1/27/98 | 9 - 10 |
| | | | $ 793,298.00 | $ 23,798.94 | $ 79,329.80 | $ 690,169.26 | $ - | | |

# MAH, INC. AND AUTOMATED NETWORK SYSTEMS, INC.
## EXCHANGE BANK
## DISPOSITION OF QUESTIONED INVOICES

| | | Due Date | Amount | Discount Fee (8%) | Reserve Amount (10%) | Net Proceeds of Loan | Proceeds Not Documented as Paid | Date Paid | Document Number(s) |
|---|---|---|---|---|---|---|---|---|---|
| 03/07/97 | 970015 NISE EAST | 4/28/97 | $ 352,000.00 | 10,560.00 | $ 35,200.00 | $ 306,240.00 | | Prior to 8/28/97 | 73-75 |
| 06/04/97 | 960844 NEWTON PUBLIC SCHOOLS | 7/25/97 | $ 175,581.00 | 5,267.43 | $ 17,558.10 | $ 152,755.47 | | Prior to 8/28/97 | 76-77 |
| 06/04/97 | 960842 FLOYD CO BOE | 7/25/97 | $ 132,000.00 | 3,960.00 | $ 13,200.00 | $ 114,840.00 | | Prior to 11/18/97 | 78-79 |
| 06/2/97 | 961013 ORANGEBURG SCHOOL DISTRICT | 7/25/97 | $ 53,470.00 | 1,604.10 | $ 5,347.00 | $ 46,518.90 | | Prior to 11/18/97 | 80-79 |
| 06/2/97 | 961011 SI BAKER, INC. | 7/25/97 | $ 23,490.00 | 704.70 | $ 2,349.00 | $ 20,436.30 | | Prior to 11/18/97 | 81-79 |
| 06/2/97 | 960994 FLOYD CO BOE | 7/25/97 | $ 33,473.68 | 1,004.21 | $ 3,347.37 | $ 29,122.10 | | Prior to 11/18/97 | 78-79 |
| 06/2/97 | 960989 FLOYD CO BOE | 7/25/97 | $ 39,053.00 | 1,171.59 | $ 3,905.30 | $ 33,976.11 | | Prior to 11/18/97 | 78-79 |
| 06/2/97 | 960995 FLOYD CO BOE | 7/25/97 | $ 39,053.00 | 1,171.59 | $ 3,905.30 | $ 33,976.11 | | Prior to 11/18/97 | 78-79 |
| 06/2/97 | 960996 FLOYD CO BOE | 7/25/97 | $ 39,053.00 | 1,171.59 | $ 3,905.30 | $ 33,976.11 | | Prior to 11/18/97 | 78-79 |
| 06/2/97 | 960991 FLOYD CO BOE | 7/25/97 | $ 53,000.00 | 1,590.00 | $ 5,300.00 | $ 46,110.00 | | Prior to 11/18/97 | 78-79 |
| 06/2/97 | 960992 FLOYD CO BOE | 7/25/97 | $ 53,000.00 | 1,590.00 | $ 5,300.00 | $ 46,110.00 | | Prior to 11/18/97 | 78-79 |
| 06/2/97 | 960993 FLOYD CO BOE | 7/25/97 | $ 53,000.00 | 1,590.00 | $ 5,300.00 | $ 46,110.00 | | Prior to 11/18/97 | 78-79 |
| 06/2/97 | 960998 FLOYD CO BOE | 7/25/97 | $ 39,053.00 | 1,171.59 | $ 3,905.30 | $ 33,976.11 | | Prior to 11/18/97 | 78-79 |
| 06/2/97 | 960999 FLOYD CO BOE | 7/25/97 | $ 33,473.68 | 1,004.21 | $ 3,347.37 | $ 29,122.10 | | Prior to 11/18/97 | 78-79 |
| 10/01/97 | 970320 GA DEPT OF TECH/ADULT ED | 10/11/97 | $ 38,392.00 | 1,151.76 | $ 3,839.20 | $ 33,401.04 | | 10/24/97 | 16-20 |
| 10/01/97 | 970321 GA DEPT OF TECH/ADULT ED | 10/13/97 | $ 38,392.00 | 1,151.76 | $ 3,839.20 | $ 33,401.04 | | 11/20/97 | 21-25 |
| 10/01/97 | 970322 GA DEPT OF TECH/ADULT ED | 10/15/97 | $ 38,392.00 | 1,151.76 | $ 3,839.20 | $ 33,401.04 | | 9/18/97 | 26-28 |
| 10/01/97 | 970323 3/ GA DEPT OF TECH/ADULT ED | 10/16/97 | $ 38,392.00 | 1,151.76 | $ 3,839.20 | $ 33,401.04 | | 1/15/98 | 29-31 |
| 10/01/97 | 970324 GA DEPT OF TECH/ADULT ED | 10/18/97 | $ 38,329.00 | 1,148.87 | $ 3,832.90 | $ 33,346.23 | | 10/23/97 | 32-34 |
| 10/01/97 | 970325 GA DEPT OF TECH/ADULT ED | 10/18/97 | $ 38,392.00 | 1,151.76 | $ 3,839.20 | $ 33,401.04 | | 10/31/97 | 35-37 |
| 10/01/97 | 970332 GA DEPT OF TECH/ADULT ED | 10/18/97 | $ 38,392.00 | 1,151.76 | $ 3,839.20 | $ 33,401.04 | | 10/20/97 | 38-40 |
| 10/01/97 | 970337 GA DEPT OF TECH/ADULT ED | 10/19/97 | $ 38,329.00 | 1,148.87 | $ 3,832.90 | $ 33,346.23 | | 11/25/97 | 41-43 |
| 10/01/97 | 970328 GA DEPT OF TECH/ADULT ED | 10/21/97 | $ 19,196.00 | 575.88 | $ 1,919.60 | $ 16,700.52 | | 10/20/97 | 44-46 |
| 10/01/97 | 970329 GA DEPT OF TECH/ADULT ED | 10/21/97 | $ 19,196.00 | 575.88 | $ 1,919.60 | $ 16,700.52 | | 10/24/97 | 47-49 |
| 10/01/97 | 970330 GA DEPT OF TECH/ADULT ED | 10/22/97 | $ 19,196.00 | 575.88 | $ 1,919.60 | $ 16,700.52 | | 10/31/97 | 50-52 |
| 10/01/97 | 970331 GA DEPT OF TECH/ADULT ED | 10/22/97 | $ 19,196.00 | 575.88 | $ 1,919.60 | $ 16,700.52 | | 11/18/97 | 53-55 |
| 10/01/97 | 970333 GA DEPT OF TECH/ADULT ED | 10/25/97 | $ 19,196.00 | 575.88 | $ 1,919.60 | $ 16,700.52 | | 12/19/97 | 56-59 |
| 10/01/97 | 970334 GA DEPT OF TECH/ADULT ED | 10/25/97 | $ 19,196.00 | 575.88 | $ 1,919.60 | $ 16,700.52 | | 12/23/97 | 60-62 |
| 10/01/97 | 970335 GA DEPT OF TECH/ADULT ED | 10/27/97 | $ 19,196.00 | 575.88 | $ 1,919.60 | $ 16,700.52 | $ 16,700.52 | | |
| 10/01/97 | 970336 GA DEPT OF TECH/ADULT ED | 10/27/97 | $ 19,196.00 | 575.88 | $ 1,919.60 | $ 16,700.52 | | 9/30/97 | 63-65 |
| 10/01/97 | 970337 GA DEPT OF TECH/ADULT ED | 10/31/97 | $ 19,196.00 | 575.88 | $ 1,919.60 | $ 16,700.52 | | 10/16/97 | 66-68 |
| 10/01/97 | 970338 GA DEPT OF TECH/ADULT ED | 10/31/97 | $ 19,196.00 | 575.88 | $ 1,919.60 | $ 16,700.52 | 16,700.52 | | |
| 10/01/97 | 970339 GA DEPT OF TECH/ADULT ED | 10/31/97 | $ 19,196.00 | 575.88 | $ 1,919.60 | $ 16,700.52 | 16,700.52 | | |
| 10/01/97 | 970340 GA DEPT OF TECH/ADULT ED | 11/5/97 | $ 19,196.00 | 575.88 | $ 1,919.60 | $ 16,700.52 | 16,700.52 | | |
| 10/01/97 | 970341 GA DEPT OF TECH/ADULT ED | 11/5/97 | $ 19,196.00 | 575.88 | $ 1,919.60 | $ 16,700.52 | | 10/28/97 | 69-70 |
| 10/01/97 | 970342 GA DEPT OF TECH/ADULT ED | 11/6/97 | $ 19,196.00 | 575.88 | $ 1,919.60 | $ 16,700.52 | | 11/4/97 | 71-72 |
| 10/01/97 | 970343 GA DEPT OF TECH/ADULT ED | 11/6/97 | $ 19,196.00 | 575.88 | $ 1,919.60 | $ 16,700.52 | $ 16,700.52 | | |
| 11/17/97 | 100550 SC TECHNICAL EDUCATION | | $ 77,750.00 | 2,332.50 | $ 7,775.00 | $ 67,642.50 | $ 67,642.50 | | |
| 11/17/97 | 100554 SC TECHNICAL EDUCATION | | $ 77,750.00 | 2,332.50 | $ 7,775.00 | $ 67,642.50 | 67,642.50 | | |
| 11/17/97 | 100558 SC TECHNICAL EDUCATION | | $ 77,750.00 | 2,332.50 | $ 7,775.00 | $ 67,642.50 | 67,642.50 | | |
| 11/17/97 | 100560 SC TECHNICAL EDUCATION | | $ 77,750.00 | 2,332.50 | $ 7,775.00 | $ 67,642.50 | 67,642.50 | | |
| 11/17/97 | 100564 SC TECHNICAL EDUCATION | | $ 77,750.00 | 2,332.50 | $ 7,775.00 | $ 67,642.50 | 67,642.50 | | |
| 11/17/97 | 100565 SC TECHNICAL EDUCATION | | $ 77,750.00 | 2,332.50 | $ 7,775.00 | $ 67,642.50 | 67,642.50 | | |
| 11/17/97 | 100568 SC TECHNICAL EDUCATION | | $ 77,750.00 | 2,332.50 | $ 7,775.00 | $ 67,642.50 | 67,642.50 | | |
| 11/17/97 | 100581 SC TECHNICAL EDUCATION | | $ 77,750.00 | 2,332.50 | $ 7,775.00 | $ 67,642.50 | 67,642.50 | | |
| 11/17/97 | 100582 SC TECHNICAL EDUCATION | | $ 77,750.00 | 2,332.50 | $ 7,775.00 | $ 67,642.50 | 67,642.50 | | |
| 11/17/97 | 100585 SC TECHNICAL EDUCATION | | $ 77,750.00 | 2,332.50 | $ 7,775.00 | $ 67,642.50 | 67,642.50 | | |
| 11/17/97 | 100587 SC TECHNICAL EDUCATION | | $ 77,750.00 | 2,332.50 | $ 7,775.00 | $ 67,642.50 | 67,642.50 | | |
| 11/17/97 | 100588 SC TECHNICAL EDUCATION | | $ 77,750.00 | 2,332.50 | $ 7,775.00 | $ 67,642.50 | 67,642.50 | | |
| 11/17/97 | 100589 SC TECHNICAL EDUCATION | | $ 77,750.00 | 2,332.50 | $ 7,775.00 | $ 67,642.50 | 67,642.50 | | |
| | | | $ 2,491,150.36 | 74,734.51 | $ 249,115.04 | $ 2,167,300.81 | $ 769,927.60 | | |

| | | |
|---|---|---|
| MAH | | $ 83,502.60 |
| ANS of SC | | $ 676,425.00 |